Silver Cross Hospital and Medical Centers, Appellee, Cross Appellant, by Megan Preston v. GV Designer Homes, Appellant, Cross Appellee, by Michael Martin. In order to make that development more valuable, and prior to entering into a purchase agreement with my client, the seller had Village Station annexed into New Lenox and preliminary approved as a transit-oriented or TOD development, and that it's centered around a Metro train station. As part of those TOD approvals, the seller entered into what the parties referred to as the Metro Agreement, in which the seller conveyed three parcels of Village Station to Metro, and one of those parcels, Metro, actually built its train station. The two other remaining Metro parcels were reutilized as surface parking. However, pursuant to the Metro Agreement, the seller retained the right to swap out or exchange those Metro surface parking parcels in exchange for building a parking deck, and that's what the parties have always referred to as the Metro swap. After this was approved as a TOD development and annexed in, my client entered into a purchase contract with the seller to buy about 216 acres at the price of $26.5 million. Pursuant to that agreement, my client made three deposits of earnest money, bringing the total amount of money to $1.325 million. Also pursuant to that agreement, in utilizing the Metro swap, my client submitted development plans to the Village in New Lenox. And although at trial, the seller's representative, Mr. Brownlow, testified that the swap was nothing more than a pipe dream, the seller did sign off on her development plans and participated in the development process. After approximately just under a year, and after my client spent over $2 million on the entitlement process, the Village did approve my client's development plans, which were dependent or reliant on the Metro swap. The parties then executed the Fifth Amendment, which bifurcated the closing up into three different phases. In order to depict the phases, the seller elected to use our development plan, which showed the property as if the Metro swap had occurred. The Fifth Amendment also held back the earnest money until the final Phase III closing, so the seller would only get the benefit of the earnest money if it fully performed. The Phase I closing did occur. My client paid the seller in excess of $11 million. However, the Metro swap never occurred, so my client paid $11 million not for the TOD development they contracted for, but essentially for undeveloped farmland until the swap occurred. The Phase II and Phase III closings did not occur, and both parties declared one another in breach. Was the swap ever actually in the contract? It was in the Metro agreement. The Metro agreement was between... It was between the seller and Metro. And not you. And not us. There was a provision of that agreement as the successor was supposed to be assigned to us, but the Metro agreement was never assigned to GB. So what was the legal basis for your claim that you had the right to enforce the swap? The issue is when we got to the Fifth Amendment and after we had spent over a year on approvals, and the swap was marketed prior to us entering into this, and they signed off on a development plan they knew was contingent on the swap, they then elected to use our development plan contingent on the swap to describe the property that was to be conveyed at each closing. In the Phase I, the Phase I closing we bought, the swap did not occur. We couldn't get building permits. And then the Phase II and the Phase III closings did not occur. But back to the question, how do you take advantage of a statement in another document that's not part of the contract? Well, I think that gives rise to our estoppel claims that we believe the trial court found in error against us because of the marketing, the reassurances, the signing off, and the participation of the seller in the development plan. They knew the swap that was dependent on the swap, which they had the authority to do unless they assigned it to us, which never occurred. However, and then when they incorporated our development plan into the agreement under the Fifth Amendment, at that point in time then, we were essentially reliant on the seller helping us get the swap done, which the facts in evidence show they did nothing, and at no point in time did they ever disclose to us that it was, as their representative described at trial, a pipe dream or lightning in a bottle until he came in trial and testified that's what the true feasibility is. See, I'm trying to fit this into some kind of contractual relationship, okay? And your position is that we have a contractual relationship because in one case you're saying they referred into a separate document, but you weren't a party to the plan that you had set out. So when they adopt that, somehow they're adopting you as... Well, I think at a minimum when they incorporated and used our plan to depict the phases, it may have made it a condition precedent that the swap occurred because that's what the property was depicted to be conveyed at each closing. What kind of contract principle do you rely on to have that emerge as a contractual obligation? Well, if you look at the depictions attached to the Fifth Amendment, they clearly showed the property as if the swap had occurred. They had readily available legal descriptions, other plats they could have used that showed the property on swap. The seller, in its own discretion, elected to use our plan. What's the contract principle though? I mean, what contract? Well, I think... You're not electing your third party beneficiary. No, we're not. And I'm trying to fit estoppel into terms that, you know, whether there was a unilateral promise or... I mean, I'm trying to fit this into a restatement of contracts or, you know, contract principles, and I'm having difficulty fitting this in. What are the elements of your estoppel argument? Well, I think in regards to the estoppel argument, they had a duty to disclose, one, that they were in a fight with Metro that impacted the feasibility of the swap. So where does this duty arise from? Well, in our estoppel claim, one can't sit by silently and fail to disclose facts they know of. And here, at no point in time did they ever tell us that the swap was just merely a pipe dream. They, in fact, encouraged us and signed off on development plans they knew all along, sat back and allowed us to spend, and that's us, the $2 million to get those plans approved. I know those are some underlying facts, but usually if there's a duty to disclose, the duty arises under some kind of legal principle. So where's the legal principle where the duty to disclose arises? Because now you're fitting that into your... I mean, you'll fit that into your sort of estoppel argument. I'm trying to understand these and putting it in the legal boxes, okay? There's an applied duty of good faith and fair dealing, and there's actually a contractual provision of the contract indicating that the parties would cooperate to assure everything that needed to get done got done. And who are the parties to that contractual agreement? That was my client in the cellar. It's in our agreement, in our purchase agreement, there's a specific provision that essentially restates the applied duty of good faith and fair dealing. And I think their failure to disclose this true feasibility of the swap was a breach of contract. Or at a minimum, when they incorporated a development plan to depict the property, he created a condition precedent that the swap must occur, otherwise there's no breach if the precedent hasn't been satisfied. What was the purpose of the contract you did enter into? The purpose was to buy a TOD development, not buy undeveloped farmland. Which is what we essentially did at the Phase 1 closing because the swap never occurred. We couldn't get building permits, we couldn't do anything with the property until the swap occurred. And was that ever contingent in that other contract? Not specifically, other than the cellar adopting their development plan to depict the property. Let me back up. Because I didn't see anything in that contract which made that as a subsequent condition preceding anything, right? And so you're backing it in using their use of this other agreement and you're somehow saying that that backed up into the other contract. What they did, they specifically used our plat, which was recorded as well, to depict the property. So I believe that when they included our plat into it to depict the property, which clearly shows the property swapped, that that made it at least a condition precedent. And where did they find that plat? We had provided it to them. It was actually a recorded document that they elected to use. They had other documents, other legals that could have used it. As I understand it, it was a recorded document that's accessible to the general public. That is correct. So they utilized that. Is there any case that has a contract principle like this where there's a relation, once you use somebody else's stuff, there's somehow a relation back to make it an exact obligation? Well, I think we cited in our briefing, I don't recall the exact name, but if you use a recorded plat, the recorded plat does control. So if the use of a recorded plat controls the description of the property, and here you had a recorded plat, and granted, I think they used the prior version and it was actually ultimately recorded, but it did not impact the Metro parcels in any way. That's using it for the description of the property. You're using it for much more than that. You're using it for contractual obligations. But if the recorded plat controls the property to be conveyed, and that recorded plat shows the property swapped, then at that point I think you do have a contractual obligation or at least a condition precedent that the property meet what's shown on the recorded plat. And that's the principle I'm wondering. Is there any case that's even close to that? I haven't found anything. I mean, I'm not trying to put you on the spot. These are, you know, this whole case revolves around contractual principles. It does. I'm trying to understand how they fit into the contractual principles box. I'm using the restatement of contracts just as an example. There's a whole variety of different ways that people get contractual obligations and are bound by them, and a breach is a breach. But I'm trying to find out how this gets into, you know, I mean, this is not the classic like detrimental reliance and that kind of stuff where they're enforcing sort of quasi-contractual principles or something because of detrimental reliance and that. That doesn't fit into that box. Would you agree? I would agree with you. I think another issue which we also raised is the trial court failed to recognize that the use of this plat clearly created ambiguity that the parties may, in fact, have had different interpretations. They didn't use what they had available at their hand to describe it unswapped. They used our plat, which is recorded, to show it swapped.  I think based on the trial court's failure, we've made a claim they erred in failing to properly interpret the contract when the seller elected to use our recorded plat, which I would ask you to find in our favor. It sounds like the swapped property was critical to your development. Yes, it was. When did you put it in the contract? As the evidence showed at trial, it was more reassuring to us that this was kind of a slam dunk, that it wasn't a big issue. And I think a part of that was because we didn't know of, one, between the fight between METRA and the seller, and, two, we certainly didn't know of what the seller's, I guess, representation to us, that this was very viable options turned out to be false when they're sitting there at trial telling me it's a twinkle in their attorney's eyes. You never alleged that this was a fraudulent? No, I didn't. That there was a misrepresentation or a fraud? I didn't because one of the issues is we didn't know until we got to trial and their representatives sat there and started making these comments that it's lightning in a bottle, it's a pipe dream, something I never thought would get done. If that had been disclosed earlier, maybe we would have added a fraud claim. But it was represented, it was marketed, we kept getting reassurances, they sat through the entire development process, which I think the Hahn case we cited was pretty on point on. You can't sit by silently and then object to the use of the property as an owner that's been approved. And that's almost exactly what happened here, is they sat through the development process, attended meetings, signed off on a plan that was all relying on the swap, and now they're coming and telling us, well, you still have to buy the property even though it's undeveloped because the swap hasn't occurred. I would like to turn... One of the biggest issues in this case, though, was also the enforceability of the liquidated damages clause. And I think it was quite clear that in Illinois you have to satisfy the restatements of contracts. I think the first element was not met. There was no showing the parties had attended to agreement of damages in the event GV paid $11 million for the Phase 1 property but did not purchase Phase 2 and 3. Just briefly, as we stated in our brief, the contract specifically said the earnest money deposit was being made to secure performance. You look at the common element created by the Fifth Amendment and that this clause awards the same amount of damages regardless of the severity of the breach. We've purchased no phases. They get $1.325 million. We give them $11 million for Phase 1. They get $1.325 million. We purchase two phases and give them an excess of $70 million. They get $1.325 million. I think the first element of the restatements was not met. I think looking at the second element, just briefly, there's not a reasonable anticipation of damages in the event the seller would suffer if GV purchased Phase 1 but not Phase 2 and 3. There's no evidence that it bore some reasonable inflation after they were paid $11 million and netted $10.8 million in profit. And more importantly, the Fifth Amendment and holding it back to the final phase create an inverse relationship that the Nossinger case specifically found makes it unenforceable. As we pay more money in each phase, the earnest money deposit increases in percentage the remaining purchase price. The seller nets significant profits at each phase, yet we have no benefit to the earnest money unless we fully perform. And as they admitted and testified to a trial, the purpose of that was an inducement to close. It was a clear mechanism to secure performance. I think the elements have not been met. And I think as we stated in our brief and the evidence that was presented shows the seller suffered no damages at all. So you also have questions of whether or not this earnest money resulted in a windfall award. But we claim since the clause did not meet the first two elements, you have to satisfy all three elements of the restatement of contracts to be enforceable in Illinois. It was a clear mechanism or penalty to secure performance. And since they did not prove actual damages, we are entitled to a refund or retain the earnest money deposit since it was a mechanism to secure performance. Just briefly, I'll just add... Are you saying you're entitled to keep all of it or a pro rata share based on your completion of the first phase? I believe... Well, that wasn't that... I believe the way the contract's written and the fact that it was written as a mechanism to secure, the case law supports that all money deposited should be returned to GB. Yes, but we did close on phase one and the clause as written was a clear mechanism and it doesn't satisfy the restatement elements to be enforceable. And the case law suggests that if the clause is unenforceable and is a mechanism or penalty to secure performance, the entire amount of liquidated damages must be returned to the party regardless or not if they breach the agreement. You can't enforce... And if there is a breach in that instance, then the seller would only have been entitled to actual damages. But in this case, they didn't prove actual damages, something they've admitted. They admitted that in their response. And in fact, the evidence shows they had no actual damages. They netted $10.8 million, had their property fully entitled for free, the remainder property and additional property they owned that they weren't selling to us. So I think that's our position, that because it was unenforceable, the money should be returned to us or at a minimum the seller would only be entitled to their actual damages, which the evidence here shows they're not. But the... What you're asking to be returned is the completed contract from before. No, we're asking for the $1.325 million. I don't think the $11 million... We didn't make a claim of something I don't think would have been possible. Well, what's the relationship between the Fifth Amendment and the Sixth Amendment? Well, the Sixth Amendment was added, I think... It was added, one, they wanted a restricted covenant added essentially to the first phase that we had already purchased.  because they threatened to retain our earnest money unless we agreed to their demands at that point. And again, they used our plats. And during it, as we laid out in our brief, we were making continued requests about trying to get the metro swap done. They said, sign the amendment, we'll get back to you. And then afterwards they said, no, we're not doing anything. That's signed the Sixth Amendment. Signed the Sixth Amendment, yes. And does the Sixth Amendment have anything to do with the Fifth? Other than it amended the closing dates and it amended the... It was adding a new restriction to property we already purchased. Not really, no. I would ask you to correct the errors of the trial court and find it in our favor. I'd like to thank you for your time today. Any other questions? Thank you, Mr. Martin. Ms. Preston? Good afternoon. Good afternoon. May it please the court and counsel, my name is Megan Preston. I represent Silver Cross Hospital. My client filed a claim to recover the earnest money deposits in this case. We filed it as a declaratory judgment action so we could receive an order releasing the funds from escrow due to G.V.'s breach of the contract. G.V. filed a three-count complaint and in each of its three counts it sought identical relief. Orders requiring the escrow funds to be released to it as well as some other damages. So everyone in this case is actually seeking to enforce the liquidated damages provision at issue. The provision is enforceable under Illinois law. It's enforceable where the parties agree to it, agree that it's going to be damages. It's a reasonable estimate of actual damages and actual damages are difficult to determine. They're used all of the time in real estate contracts. The Cremey case actually discussed that matter. That was a case in the city of Chicago where the buyer was purchasing a condo in some parking spaces. After the buyer breached the agreement and failed to close, the seller actually sold the same condo and parking spots for more than the buyer's contract. So in other words, they didn't sustain any actual damages. The Cremey court found these are provisions that are used in real estate contracts because damages are difficult to determine in real estate contracts. And the parties risk that actual damages could be higher or lower. So in that case, the provision was upheld as not being a penalty. In our case, the parties entered into a contract regarding a large piece of undeveloped real estate. As of trial and even as of today, my client has not sold the two remaining parcels. So we don't yet know what our actual damages are going to be because we don't know if we're going to be able to sell the property eventually for the same contract price or for a lower contract price. Contracts that penalty provisions are where the sole purpose of the provision is to secure performance. It's not simply where there is a hope that it will secure the other party's performance. I think all contractual provisions are intended to hope to secure your opposing a party's performance. There were several cases cited by both parties where the courts found that the provision was, in fact, a penalty. First of all was the Med Plus case. That was an employment contract case where over time the employer's damages would rise. But under the penalty provision, the employee was actually required to pay lesser damages over time. And the court found that because of the inverse relationship between those two realities, that there was a clear penalty. In the Grossinger case, the court found that there was a penalty provision because the seller in that contract was allowed to claim to recover either liquidity damages or if its actual damages were higher, it could recover the actual damages instead. Parties can't opt which type of damages they're going to recover if they have a liquidity damages provision, so that was a penalty. In the GK case, the provision was a penalty because the liquidated damages provision applied regardless of the type of the breach. So even if there was only a minor breach, for example, an extension of closing by one day, the seller would be entitled to the liquidated damages. In our case, we have liquidated damages that apply only if the parties fail to close. Now, the standard for the liquidated damages, whether it's reasonable, would be when the contract was entered into. Correct. Okay, and so at the time the contract was entered into, there was some uncertainty about what damages would be. Correct. Which gave rise to making the determination of what would be a reasonable liquidated damages clause. Correct. So how does the reasonable estimation of a liquidated damages clause relate to the uncertainty causing you to look for a liquidated damages clause? I'm not sure I understand your question. That uncertainty, does it prevent you from finding a reasonable liquidated damages clause? I don't think the fact that there's uncertainty, actually I think there needs to be some uncertainty in order to have a liquidated damages clause, otherwise everybody would just use their actual damages, so I think that's part of the test, is that damages will be difficult to determine in the future because the parties don't know at the time of the contract what's going to happen in the future, which is why real estate is a particularly good example because you never know if the value of real estate is going to go up or down and how difficult it might be to find an actual buyer. The best case scenario for damages in real estate would be the seller always finds another buyer and then can simply look at the difference between what it was sold for and what the original contract was for, but that's often not the case. So how is reasonable defined? Reasonable is simply defined as having some relationship to what anticipated or actual damages are. So I agree that the law kind of provides a look both directions type of definition, but there is no requirement that the seller has to prove its actual damages to support the liquidated damages provision, because in fact, like here, in many cases you don't yet know what your actual damages are when the parties are litigating the liquidated damages provision. I mean, reasonable has to relate to it would be your potential damages. Correct. What you're hoping... Potential actual damages. Correct. So six years, some years later, you don't always know what that's going to be. I don't think the phasing of the property into separate purchases changed the fact that the liquidated damages provision is reasonable. I think GD's argument relies on solely determining actual damages based on the overall purchase price of the property. But what the liquidated damages provision actually accounted for here were things like your compensation for having the property off the market, losing your opportunity for having the property off the market, kind of your holding costs over time, and to remarket the property. And those types of damages are not going to change over time, regardless of how big or small the parcel of property is. When you initially entered into the contract, the liquidated damages went for the entire... all of the land. Right. And the entire development. Right. And there were no changes at the time you switched into phases in the liquidated damages provision? Not specifically. There were changes because eventually more money was paid into the earnest money account, but no. There was no specific change changing the amount of the escrow funds. I'm sorry, the liquidated damages. Doesn't it seem that there should have been some modifications since you were now dealing with three phases instead of one? I don't believe so because I think the cost to my client of keeping the property, of losing opportunities, and of remarketing the property is the same regardless of the size of the property. Well, one project was completed. It was. So you didn't have any damages with regard to that. True. Your loss is with regard to the two phases, so you're dealing with two-thirds of the property rather than the entirety. Right. But I don't think those costs increase because the size of the property... I'm sorry, increase or decrease because the size of the property that's remaining is different. So in other words, the cost to remarket three phases is the same as the cost to remarket one phase. That doesn't make sense to me. I'm sorry. It just doesn't compute for me. My point is that the cost of keeping the property is the same regardless. But the one you're not keeping. True. It's done. So now you're only keeping two-thirds of what you were originally keeping at the time that you adopted or agreed upon the liquidated damage cost. Right. Was there some discussion of applying some of the earnest money towards the second or third phase? The final. So how would... Were you treating them as liquidated damages? If you were going to allow them to draw on the escrow to purchase the third parcel, is that inconsistent with treating the escrow as liquidated damages? I don't think so. If the final phase closes, there would be no damages because at that time everything is complete. With regard to the swapping of the lots, what is your argument with regard to the fact that you relied on the plath that showed the swap? If you look at the drawings of the plaths that are actually attached to the Fifth and the Sixth Amendment, they're not clear, definite, and certain depictions of the property. And in fact, they should include a property that everybody agrees is not included in the sale. So, for example, the pictures actually show property outside of the boundary of what my client owned. They include both the Metro parcels that GB wanted and the Metro parcels as they actually existed. So I don't think that those drawings can change what the parties were agreeing to buy. In fact, both the Fifth and Sixth Amendment include as exhibits the covenants and restrictions that the parties were agreeing to record on the property, which include the same legal descriptions of the property that are included in the original agreement. And keep in mind, the amendments are only changing certain provisions of the contract. The amendments are not full revisions of the original contract. And both the Fifth and Sixth Amendment amendments specifically say they're only making changes to the contract where they specifically say in the provision. So I think it was clear to all of the parties we were relying on the original legal descriptions of the property. Everyone knows at the time the Fifth Amendment is signed that Silver Cross doesn't own the Metro parcels, even though the drawings show all of the Metro parcels. And then GB goes on to close on the first phase of the property, including the purchase of the Metro parcel as it existed. GB then signs the Sixth Amendment to the agreement. Having the Metro parcel where it is, there is a legal description included in the Sixth Amendment of the property that GB currently owns. And that excludes the existing Metro parcel. So everyone knew every step of the way that Silver Cross didn't own the Metro parcel, that GB was not purchasing the Metro parcels, and none of the agreements actually change that. The estoppel issue that's raised by GB is improper here because we have a contract that controls the relationship between the parties. You cannot bring a promissory estoppel claim where your contract consideration is, your consideration is the same in your estoppel claim as it is in your contractual claim. And here that's exactly what we have. And I think GB acknowledges that where they are actually seeking contractual damages in their promissory estoppel claim because they seek to enforce the liquidated damages provision by seeking to return the earnest money to them and by seeking the attorney's fees that are included in the liquidated damages provision in each count of their complaint, including the promissory estoppel claim. There was an issue raised by GB in its reply brief that Silver Cross failed to preserve that argument for appeal. I think that's incorrect. It was raised in both opening and closing argument at trial when Silver Cross pointed out that GB was seeking the same liquidated damages that Silver Cross was seeking. So I think all of the parties here are trying to enforce the same provision. You're arguing that opening and closing argument constitutes the evidence that preserves the issue? Preserves the issue on appeal when it was raised by GB for the first time at trial. There were no pleadings alleging that the liquidated damages provision was unenforceable. I have one more question. I'm just curious. Why do you get attorney fees and liquidated damages? If the liquidated damages are supposed to be the sole remedy? I think the liquidated damages are both. Your Honor, that's an interesting question and not something that was actually raised by either party in this issue. I suppose you could look at it as liquidated damages being both the earnest money and the attorney's fees. I'm actually not aware of any court case saying that you can't get your attorney's fees in a liquidated damages case. But I have to say I've actually not given that matter thought. I was just curious. I couldn't figure that out. Absolutely. It's the first time that question's been raised, but it is an interesting issue. What's the basis for the attorney's fees? It's in the liquidated damages provision of the contract. And again, both parties are seeking their attorney's fees in this matter. And that's because it's specified. Correct. It's specified in the liquidated damages provision that the prevailing party can recover its attorney's fees. The last issue I'd like to address is our cross appeal. The main issue in our cross appeal is that the trial court found that GB breached the contract and then awarded to GB extension fee payments and farm lease payments out of the amount of the earnest money deposits. First of all, I don't believe that GB is entitled to any monies if it does not succeed on its counterclaims. So the court finds that GB breached its contract. I don't think it can award monies to GB. The extension fees and the farm lease payments were not part of the earnest money deposits. Those were funds paid from certain of the amendments to the contract. GB essentially purchased the right to extend the closing dates. The extension fees were paid directly to Silver Cross. They weren't paid into the deposit amounts. And the farm lease payment was actually paid to the farming tenant, Mr. Costle. So these are not funds that were ever part of the earnest money deposits. Even if the trial court were correct, that GB would be entitled to retain some amount from the earnest money deposits, even if it breached the contract. It certainly isn't entitled to recover any sort of an actual damage. I believe the trial court made the right decision in finding that the liquidated damages provision was an enforceable provision. And in awarding Silver Cross the earnest money deposits as its liquidated damages under its declaratory judgment account. Again, GB also brought a declaratory judgment action. Although GB disputes on appeal that Silver Cross is entitled to receive funds pursuant to a declaratory judgment action. That issue was not raised before the trial court. I think that's a pleading issue that would need to be raised by way of motion to dismiss. GB here answered the claim. Either way, it brought the identical claim  So I think the court's award of damages under the liquidated damages provision under Silver Cross's complaint was appropriate. I think the trial court's only error was in misunderstanding which funds were included in the liquidated damages provisions. The only funds held in the escrow account were the funds that were intended to be liquidated damages. Thank you. Thank you, Ms. Preston. Mr. Martin, you get rebuttal and a chance to respond to the cross appeal. Thank you. I think it's pretty clear that the hold back of the earnest money and not applying any percentage to the phase closings was as confirmed by the seller was that it was an inducement to close, that it was a penalty to close. We paid them $11 million and got no benefit of using our $1.325 million. If it was reasonably related to damages, they would have applied 40% of that to the phase one closing, but they didn't. As their representative testified to the trial, the purpose of this was to secure our performance. That makes the clause unenforceable. Now the seller has been up here and talking about how it was reasonable because it related to certain carrying costs. Well, the only carrying cost entered into evidence was the fireman invoice, which we paid. They also talked about that they had lost time and opportunities, which they never identified at trial, and they ignore that they did get $290,000, excess of $290,000 paid for extension fees. So you can't say their damages are the same after each phase closing, that it's a reasonable estimate of the damages they would suffer after each phase. They can't have the same amount of damages if they get $11 million from phase one or $17 million if we close on phase two, and they get the same amount of damages. That's what makes this clause unenforceable. It's the common element that the GK development case cited from the XCO 7th Circuit case. It awards the same damages regardless of the breach, regardless if we close on any property, regardless if we bought one or two phases, regardless if they declared a breach for some other reason and the property didn't proceed to close it. There was a closing, though. There was a closing. There was a closing. So what's the language with respect to liquidated damages? Does it say final... I mean, there was a closing. You fulfilled the Fifth Amendment. Or whatever amendment divided it into... The Fifth Amendment was executed and we proceeded to close it. As the Fifth Amendment stated, and when you're looking at contract modification, you've got to accept that at the time of the modification when you're entering a new contract, when they enter the Fifth Amendment, we didn't get any credit for that earnest money deposit at the phase one closing. It specifically said to hold it back. But the original contract that talks about liquidated damages doesn't talk about phase one closing, phase two closing, or phase three closing. It talks about a closing. It talks about a closing. When they enter the Fifth Amendment... Did you have a closing? We did have a closing in which we got no... didn't get to apply any percentage of that earnest money deposit. So it's arguable that a closing negated the liquidated damages clause? You could make that argument because I think, one, it would result in a windfall award for them after they get $11 million. And I think... I'll look at the language. I think when they included that provision, specifically holding it back, the purpose of that was not a reasonable estimate of their damages or an agreement of damages, as they stated themselves. It was to secure our performance in fully performing, and that's not... Is there any case law out there that tells us whether we measure a liquidated damages clause at the time it's originally granted, when there are multiple amendments to the contract? I think just under basic contract law, when you modify or amend an agreement, that's why you sue on the amended agreement, you are essentially entering into a new contract at that time. And you are adopting all the old prior terms you haven't changed, and you're entering into a new contract. So I think... Because in this case, the liquidated damages clause may have been enforceable on day one. It may not have been a penalty. It may have been a reasonable way to liquidate damages. But then, once the Fifth Amendment is written, it starts looking a little more punitive. I would agree with you on that. Is there any case law that has this back pattern that you found? Well, I think the GK development case we cited... And I also think they cite it as the Med Plus. I've called it the Knopfsinger because I can't do the percentage when I speak. But I think the fact the Knopfsinger case is almost directly on point as time goes on and the damages potentially decrease. In this case, they get significant sums at each closing and their damages potentially decrease. The earnest money deposit, the amount of liquidated damages, is increasing in the remaining performance, which would be the remaining purchase price. So I think those are two very important cases that apply and show that this clause was unenforceable. Mr. Martin, did you want to respond to the cross-appeal? I would just add, Your Honor, I think their argument ignores basic liquidated damages law. If they are awarded the liquidated damages, then they're not entitled to other sums that have been paid. I think the fact that they're claiming they had all this lost time and opportunity but at the same time were also paid extension fees, I think that's almost double consideration. I think looking, you know, if you're awarded liquidated damages, you only get liquidated damages. You don't get additional sums paid. And I believe that's why the trial court awarded us back the extension fee payments and the firemen and noise payments. I also would add that it's pretty clear when you file a declaratory judgment, you're not entitled to attorney's fees because you're not enforcing a contractual right. You're seeking a declaration to guide future conduct. And that's what they've admitted. They filed a declaratory judgment in which the court determined the liquidated damages clause was enforceable, awarded it to them, ordered GB to execute instructions to turn it over, and then on top of it, ordered GB to turn over our development documents. We spent $2 million developing. Ordered GB then to execute an original amendment to the Phase 1 property, which GB no longer owns, and then also awarded them attorney's fees. And I think that's improper pursuant to their relief sought under the declaratory judgment, which we did raise, and we did cite the sites to in the record in a brief. And as Richie also stated, a deck action can become moot at any time, and those sites are contained in our brief. But I would add that we're asking you to correct the errors of the trial court and correct the improper holdings. And I think the evidence and I think the questions of law before you show that this was an unenforceable liquidated damages clause that the Fifth Amendment clearly made a penalty. And we'd ask you to look at the other issues raised in our brief that we haven't discussed today. And also in regards to the swap, I think the mere fact that they came into trial and described the feasibility and how it was essentially a no-go, it would have been nice to know that from the get-go. And I think they had a contractual duty, whether it was in the implied duty of good faith and fair dealing, or I believe our estoppel claims, the burdens were met. So I'd like to thank you for the time today if you don't have any other further questions. Thank you, Mr. Martin. Ms. Preston, we have time for rebuttal on your cross-appeal. Unless your honors have any questions regarding, I don't have any reply to the arguments Mr. Martin just raised concerning the cross-appeal. All right. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in brief recess for a panel change.